[Cite as *State v. Nelson*, 2012-Ohio-5797.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                                    :

     Plaintiff-Appellee                         :                    C.A. CASE NO.    25026

v.                                                         :                    T.C. NO.    11CR3525/1

KYLE NELSON                                     :                    (Criminal appeal from
                                                                                Common Pleas Court)

     Defendant-Appellant                    :

                                                           :

. . . . . . . . . .

**O P I N I O N**

Rendered on the ____7th____ day of ____December____, 2012.

. . . . . . . . . .

R. LYNN NOTHSTINE, Atty. Reg. No. 0061560, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
     Attorney for Plaintiff-Appellee

LORI R. CICERO, Atty. Reg. No. 0079508, 500 East Fifth Street, Dayton, Ohio 45402
     Attorney for Defendant-Appellant

. . . . . . . . . .

FROELICH, J.

{¶ 1} Kyle Nelson was convicted after a jury trial of aggravated robbery, felonious assault, and discharging a firearm on or near prohibited premises; each charge had

an accompanying firearm specification. Nelson was also convicted after a bench trial of having a weapon while under disability. The trial court sentenced him to an aggregate term of 20 years in prison. For the following reasons, Nelson's convictions will be affirmed.

I.

{¶ 2} The evidence at trial revealed the following facts:

{¶ 3} In October 2011, James Wheeler arranged to meet Deidre Nichols at his apartment on Sailboat Run. The two agreed that Nichols would have sex with Wheeler in exchange for Wheeler's paying her $500. Nichols told Wheeler that her sister and her sister's boyfriend would be driving her to Wheeler's apartment.

{¶ 4} Wheeler and Nichols had not previously met. Wheeler knew Nichols through various social media websites, and they had exchanged text messages. Wheeler also had gone to see Nichols at the strip club where she danced, but the two had never conversed.

{¶ 5} At approximately 9:00 p.m. on October 11, Wheeler went to his apartment's parking lot to meet Nichols. Nichols arrived in a dark red Saturn; she was seated in the rear passenger area. Four other individuals were also inside the vehicle– two men in the front (Nelson and David Velez) and two teenagers (a girl and a boy) in the rear. Nelson, whom Wheeler recognized from middle school, was seated in the front passenger seat. Nelson was Nichols's ex-boyfriend.

{¶ 6} Wheeler approached the vehicle, and Nichols got out. After conversing briefly with Nichols and Nelson, Wheeler handed an envelope with several hundred dollars to the girl sitting in the middle rear passenger seat. After giving the girl a moment to count

the money, Wheeler asked if "everything was cool," so that he and Nichols could go into his apartment. Nelson pointed a gun at Wheeler and told him to "go about your business." Nichols got back into the rear of the vehicle, and the car drove off. Nichols testified that she never intended to go through with her arrangement with Wheeler; instead, she and her companions had gone to Wheeler's apartment with the intention of taking money from him.

{¶ 7} Wheeler got into his car, a 1996 Geo Prizm, and followed the Saturn out of the apartment complex so that he could get its license plate number. Wheeler called 911 as he drove and stated that his car had been "robbed." While he was speaking with the dispatcher, Nichols and the girl in the back seat looked over their shoulders and Nelson leaned out of the front passenger window. Wheeler "ducked underneath * * * the steering column" and then heard a "real loud pop," which he recognized as a gunshot. Nichols and Velez also testified that they saw Nelson lean out the window and fire a single shot at Wheeler's car. Wheeler slammed on the brakes, turned around, and returned to his apartment. Wheeler's Prizm had damage to the hood and windshield wiper arm that did not exist prior to that day.

{¶ 8} The Saturn was stopped a few minutes later by Bellbrook Patrol Officer Brian Meade. Several other officers from other jurisdictions assisted with the stop. The five individuals in the Saturn were removed from the vehicle, and a firearm was located under the front passenger seat, where Nelson had sat. Upon testing, the firearm was found to be operable.

{¶ 9} The five occupants of the Saturn were transported to the Montgomery County Sheriff's Office in Washington Township, where Nelson was interviewed by

Detective Gary Ridgeway. Nelson told Ridgeway about the text messages between Nichols and Wheeler, the plan to take $500 from Wheeler, and how Wheeler had pursued them in his vehicle. Detective Ridgeway testified that $445 was recovered.

{¶ 10} Wheeler spoke with police officers about the incident at his apartment. He initially reported that he had arranged to purchase marijuana from Nichols and had been robbed. The following day, Detective Ridgeway confronted Wheeler with his failure to tell the whole truth, and Wheeler then told the officer about the arrangement for sex that he had made with Nichols.

{¶ 11} In November 2011, Nelson was indicted for aggravated robbery (deadly weapon), felonious assault (deadly weapon), discharging a firearm on or near a prohibited premises, and having a weapon while under disability. The following month, Nelson was reindicted for the same charges with the addition of firearm specifications for the aggravated robbery, felonious assault, and discharging a firearm on or near a prohibited premises counts. Nelson moved to dismiss the specifications, claiming that the addition of these specifications without new evidence established a "spirit of vindictiveness," and he sought to review the minutes of the grand jury to support that assertion. The motion was denied.

{¶ 12} The having a weapon while under disability charge was tried to the court while the remaining charges and specifications were tried to a jury. Nelson was convicted of all charges and specifications. After consulting with the State, the trial court merged the discharging a firearm on or near a prohibited premises charge into the felonious assault charge. The court sentenced Nelson to seven years for the aggravated robbery and seven years for the felonious assault, along with three years for each of the accompanying firearm

specifications. The court found that the two offenses were committed with a separate animus, and it ordered the sentences to run consecutively to each other. The court imposed a 36-month sentence for having a weapon while under disability, to be served concurrently with the other two sentences. Nelson's aggregate sentence was 20 years in prison.

{¶ 13} Nelson appeals from his convictions, raising six assignments of error.

II.

{¶ 14} We begin with Nelson's sixth assignment of error, which states:

THE JURY VERDICT SHOULD BE REVERSED BECAUSE IT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THERE IS INSUFFICIENT EVIDENCE TO WARRANT A CONVICTION.

{¶ 15} Nelson claims that his convictions were based on insufficient evidence and against the manifest weight of the evidence. He argues that, "when error is removed" in the trial, there was insufficient evidence to support his convictions. He further asserts that the testimony of Wheeler, Nichols, and Velez was inconsistent and not credible, making his convictions against the manifest weight of the evidence.

{¶ 16} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). When reviewing whether the State has presented sufficient evidence to support a conviction, the relevant inquiry is whether any rational finder of fact, after viewing the evidence in a light most favorable to the State, could have found the essential elements of

the crime proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." Id.

{¶ 17} Nelson claims that the trial court erred in admitting certain evidence at trial and that, absent this evidence, there was insufficient evidence to support his convictions. The Supreme Court of Ohio has stated that, in reviewing the sufficiency of the State's evidence, an appellate court must consider *all* of the evidence that was admitted by the trial court, without consideration of whether any of that evidence should have been excluded. *State v. Brewer*, 121 Ohio St.3d 202, 2009-Ohio-593, 903 N.E.2d 284, following *Lockhart v. Nelson*, 488 U.S. 33, 38, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988); *State v. Troisi,* 124 Ohio St.3d 404, 2010-Ohio-275, 922 N.E.2d 957, ¶ 7. "By permitting a reviewing court to consider all the evidence presented at trial, *Lockhart's* holding recognizes that the [S]tate may rely upon the trial court's evidentiary rulings in deciding how to present its case." *Brewer* at ¶ 19.

{¶ 18} Nelson has not argued that the State's evidence, as admitted by the trial court, was insufficient to support his convictions, and we find that the State's evidence was legally sufficient. Two witnesses testified that Nelson brandished a firearm and pointed it at Wheeler immediately after Nelson's companions took Wheeler's money under false pretenses; the group then fled with Wheeler's money. In addition, the State's evidence established that, after being followed by Wheeler along several roads, Nelson leaned out of the Saturn's front passenger window and fired a shot at Wheeler's vehicle. The State's evidence, if believed, was sufficient to prove the offenses of aggravated robbery, felonious

assault, and discharging a firearm on or near a prohibited premises, and the accompanying specifications.

{¶ 19}   Nelson further argues that his convictions were against the manifest weight of the evidence.   In contrast to the sufficiency of the evidence standard, "a weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive."   *Wilson* at ¶ 12.   When evaluating whether a conviction is contrary to the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 20}   Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses.   *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997).   However, we may determine which of several competing inferences suggested by the evidence should be preferred.   *Id.*   The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14.   A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances.   *Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717.

{¶ 21}   Upon review of the record, we cannot conclude that the jury lost its way in finding Nelson guilty of the charged offenses and specifications.   The jury heard the testimony of Wheeler, Nichols, Velez, several law enforcement officers, and a firearm expert.   It was the province of the jury to assess the witnesses' credibility and determine whether the State had proven its case beyond a reasonable doubt.   Given the evidence presented, the jury's verdicts were not against the manifest weight of the evidence.

{¶ 22}   The sixth assignment of error is overruled.

III.

{¶ 23}   Nelson's first assignment of error states:

THE VERDICT SHOULD BE REVERSED BECAUSE THE TRIAL COURT ERRED IN DENYING MR. NELSON'S MOTION FOR A MISTRIAL IN TWO SEPARATE INSTANCES.

{¶ 24}   Nelson moved for a mistrial on two occasions during jury selection – once after the jury was informed that a potential witness worked for the Greene County Probation Department and once based on a response by a prospective juror regarding the presumption of innocence.   Both of Nelson's motions were denied.   Nelson claims that the trial court erred in denying his motions for a mistrial, because he could no longer receive a fair trial as a result of the offending statements during jury selection.

{¶ 25}   A mistrial should only be declared when a fair trial is no longer possible. *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991); *State v. Engle*, 2d Dist. Montgomery No. 22934, 2009-Ohio-4787, ¶ 35.   "The decision whether to grant a mistrial lies within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion."   *State v. Williams*, 2d Dist. Montgomery No. 22126,

2008-Ohio-2069, ¶ 30, quoting *State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506.   An abuse of discretion means "that the court's attitude is unreasonable, arbitrary or unconscionable."   *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

**{¶ 26}**   Early in the State's voir dire, the prosecutor told the prospective jurors that it had a long list of potential witnesses that might testify in the case.   The prosecutor stated, "And I don't want to scare you because it doesn't mean that we're going to call all of these witnesses.   But I want you to know – or I want to know whether you are familiar with any of them."   The State then listed twelve individuals from the Montgomery County Sheriff's Office, two corrections officers from the Montgomery County Jail, three officers from the Bellbrook Police Department, and three individuals from the Centerville Police Department.   The State continued:

> Now going on to other witnesses.   Andy Stockton (phonetic) with the Greene County Probation Department.   James Wheeler (phonetic), Randy Hollin (phonetic), Amanda Martin (phonetic), Deirdre Nicholls (phonetic), David Valez (phonetic).   Chris Vonturo (phonetic) with the Montgomery County Crime Lab.   Amy Vismiller (phonetic) with the Montgomery County Crime Lab.   Sergeant Matt Haines with the Montgomery County Sheriff's Office. Captain Jeff Feorida (phonetic) with the Beavercreek Police Department.

The State reiterated that it was not going to call all of the named individuals, but "we need to make sure and see if you know anyone who's involved in the case."

**{¶ 27}**   Nelson did not immediately object to the State's presentation of its witness

list to the prospective jurors. The State proceeded to ask the jurors about whether they or a close family member or friend had been a victim of a crime, had a prior criminal conviction, prior jury service, and whether they could judge a person's guilt or innocence.

{¶ 28} At the conclusion of a sidebar discussion with a prospective juror regarding one of the State's questions, Nelson's counsel moved for a mistrial, arguing that the State's mentioning of the probation officer, Andy Stockton, as a potential witness was prejudicial. Counsel argued that "[a]nyone who hears 'probation officer' knows that he's had a prior record * * * the jury's been biased at this point." The State responded that it accidentally mentioned Stockton's name (presumably because his testimony was relevant only to the having a weapon while under disability, for which a jury trial had been waived), but there was no suggestion that he would be testifying about a prior conviction. The State further asserted that any assumption about Stockton's testimony could be cured by a limiting instruction. Nelson's counsel asserted that bias had already occurred and that an instruction would not cure the defect.

{¶ 29} The trial court overruled the motion, reasoning that "just telling the person's profession * * * doesn't give any clue as to what the testimony may be." And at the end of the State's voir dire, the court gave the following instruction:

> Ladies and gentlemen, before Mr. Wilmes begins with his questions, I do want to advise you of one matter. You may have, during the State's opening remarks, heard a list of witnesses regarding also the professions of certain people that is on the witness [list]. The fact that the particular profession of a particular witness was mentioned cannot be used in any way in the

consideration of this case and should have no bearing upon the credibility of that witness. The Court is going to instruction you as to the law as to judging one's credibility. So disregard any mention of any profession of any witness mentioned by the State.

Defense counsel did not object to the wording of the court's instruction.

{¶ 30} The trial court did not abuse its discretion in denying the motion for a mistrial due to the mentioning of Stockton's name and place of employment. Stockton was listed after 20 law enforcement officers and prior to several employees of the Montgomery County Crime Lab. There was no mention of Stockton's position with the Greene County Probation Department, Stockton's relationship to Nelson, if any, or the nature of his anticipated testimony at trial. It is speculative whether any of the prospective jurors would have believed that Nelson had a prior record based solely on Stockton's place of employment. The judge's curative instruction did not mention a prior conviction or suggestion that Nelson was on probation at the time of the offenses. To the extent that any instruction was necessary, the court told the jurors to disregard the witnesses' profession and not use the profession to assess credibility. We find no basis to conclude that the jury assumed that Nelson was on probation and was biased against him.

{¶ 31} Nelson's second motion for a mistrial was made after Juror #19 responded to a question by the prosecutor regarding the presumption of innocence. After explaining that Nelson was presumed innocent and that the State had not yet presented any evidence in the case, the prosecutor asked Juror #19, "if this is all you heard, and you had to vote, what would your vote be as to guilty or not guilty." The juror replied: "This is a matter of

percentages. You asked us to come in at 50/50. And the very fact that we're here, and the very fact that the grand jury has done its job makes me essentially tend toward the hypothesis of guilty. * * * I have to tend that way."

{¶ 32} The State explained that the judge would instruct that Nelson is presumed innocent, and it asked the juror if he would have any problem voting right now that Nelson was innocent because there was no evidence yet. Juror #19 responded that his biases would be there, "but we can be logical" to overcome these biases. The State then asked another prospective juror how she felt "about the presumption of innocence, that as the Defendant sits here now, he's innocent;" she responded that she believed that Nelson was innocent. The prosecutor asked if anyone had other views; it appears there was no response. (Juror #19 was ultimately excused for cause.)

{¶ 33} Nelson did not immediately object to this exchange. Prior to beginning his voir dire, defense counsel moved for a mistrial based on the Juror #19's comment that the grand jury had done its job. Nelson argued that the response altered the burden of proof for the entire panel. The court denied the motion, indicating that its instructions would address that issue, *i.e.*, the presumption of innocence, and defense counsel could inquire into that matter during his voir dire examination.

{¶ 34} "The Sixth Amendment to the United States Constitution guarantees a defendant the right to a trial by fair and impartial jurors. In order to protect this fundamental right, the court conducts voir dire with the purpose of empaneling a fair and impartial jury, free from prejudice or bias." (Citations omitted.) *State v. Oliver*, 11th Dist. Portage No. 2010-P-17, 2012-Ohio-122, ¶ 37.

{¶ 35}   In our view, the trial court did not abuse its discretion in denying Nelson's motion for a mistrial.   At the beginning of the jury selection process (prior to the offending statement by Juror #19), the trial court gave preliminary instructions, including an instruction that an indictment "is not proof of anything" and that it merely informs the defendant of the charges against him.   The court further instructed: "The Defendant is presumed innocent unless and until the State has offered sufficient evidence to convince you beyond a reasonable doubt the existence of each and every element of the offense charged. The Defendant does not have a burden of proof.   He does not have to prove anything." (These instructions were repeated following closing arguments.)   One of the purposes of voir dire examination was to determine whether any of the prospective jurors would be unable to follow the court's instruction.

{¶ 36}   After hearing the Juror #19's statement regarding the grand jury and the presumption of innocence, the prosecutor immediately indicated that the prospective juror's view was not correct under the law.   The prosecutor addressed the issue with the other jurors, emphasizing that Nelson was, at that time, presumed innocent.   The prosecutor made sure that the other prospective jurors agreed with that view.   Defense counsel also questioned the prospective jurors about the presumption of innocence and burden of proof, and the answers to his questions reflected that the prospective jurors understood those concepts.

{¶ 37}   Given the court's instructions, the prosecutor's prompt and clear correction of the Juror #19's misstatement regarding the presumption of innocence, and defense counsel's inquiry on that subject during voir dire, the trial court reasonably concluded that

the jury pool had not been tainted and that Nelson could receive a fair trial.

{¶ 38}   The first assignment of error is overruled.

IV.

{¶ 39}   Nelson's second assignment of error states:

THE VERDICT SHOULD BE REVERSED BECAUSE THE TRIAL

COURT ERRED IN FAILING TO EXCLUDE EVIDENCE DISCLOSED

TO DEFENDANT DURING TRIAL.

{¶ 40}   In his second assignment of error, Nelson claims that the trial court erred in failing to exclude the testimony of Nichols and Velez.

{¶ 41}   At a pretrial conference on Friday, January 20, 2012, the State notified the defense that Nelson's four co-defendants had entered pleas in the case.   The State reiterated a plea offer to Nelson, which Nelson declined.   The State further indicated that it "received word just this afternoon that [Nichols was] willing to cooperate in the case against Mr. Nelson.   We have also received some notice from her attorney that there are some letters that Mr. Nelson wrote, which might be beneficial to the Defense."   The State said that it would turn over copies of the letter when they came into the State's possession and that the State would try to visit Nichols at the jail that afternoon.   Defense counsel stated that he might object to the new information being used due to the short notice.   The prosecution responded that it was not trying to withhold evidence; "[i]t's just something that we would've gotten at the last minute."   (The State had interviewed Velez on January 19, the previous day.)

{¶ 42}   Detective Ridgeway and the prosecutor interviewed Nichols on January 20.

At her interview, Nichols provided the State a copy of the letter from Nelson to Nichols. On Sunday, January 22, Ridgeway gave the prosecutor a supplemental report that he prepared based on the interviews with Velez and Nichols. The prosecutor faxed the supplemental report and letter to defense counsel during the afternoon of January 22. The prosecutor notified defense counsel to let him know the information had been faxed to his office.

{¶ 43}    Nelson's trial began on Monday morning (January 23). At some point, defense counsel informed the prosecutor that he had received only two of the 15 faxed pages. After court adjourned around 4:00 p.m., the State provided defense counsel an additional copy of all 15 pages.

{¶ 44}    Nichols and Velez were scheduled to testify on Tuesday, January 24. Before trial resumed that day, the State informed the court about the discovery it had received, its attempt to provide that discovery by fax on January 22, and the fact that defense counsel received all of the supplemental discovery at the end of court on the previous day. Defense counsel then asked the court to exclude Nichols and Velez from testifying. He argued that the supplemental materials "amplified their testimony quite a bit," that the discovery was not timely, and that he did not have ample time to prepare. Upon inquiry from the court, the State indicated that it did not intend to use the letter from Nichols and it emphasized that the supplemental report was not completed until January 22. The trial court overruled Nelson's request to have Nichols's and Velez's testimony excluded.

{¶ 45}    The admission or exclusion of evidence is left to the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion. *State v.*

*Sage,* 31 Ohio St.3d 173, 180, 510 N.E.2d 343 (1987).

**{¶ 46}** Given the circumstances of this case, the trial court did not abuse its discretion in allowing Nichols and Velez to testify. On the Friday prior to trial, defense counsel was informed that Nelson's co-defendants had recently entered pleas and that the State would be obtaining supplemental information from Nelson's co-defendants. The interviews with Nichols and Velez occurred after their pleas; the State could not have disclosed the supplemental report prior to January 22, when it was completed by Detective Ridgeway based on those interviews. Nelson's counsel indicated that he "absorbed" the materials provided by the State before Nichols and Velez testified, and counsel could and did thoroughly cross-examine those witnesses.

**{¶ 47}** Even if a discovery violation had occurred, and we do not find that one did, Crim.R. 16(L)(1), formerly Crim.R. 16(E)(3), allows the trial court to grant a continuance, as opposed to prohibiting the party from introducing the evidence that was not disclosed. "It is within the trial court's discretion to decide what sanction to impose for a discovery violation. A trial court should impose the least severe sanction for a discovery violation that is consistent with the purposes of the rules of discovery. A continuance, upon proper motion, is a favored method to avoid prejudice that may flow from a failure to provide discovery yet ensure that the charges against an accused are tried timely and fairly." (Citations omitted.) *State v. Bates*, 191 Ohio App.3d 85, 2010-Ohio-5636, 944 N.E.2d 1206, ¶ 11 (2d Dist.).

**{¶ 48}** Nelson's counsel did not request a continuance due to the alleged discovery violation, and he indicated that he had reviewed the State's supplemental materials.

Although the prosecutor waited two days to provide the letter to Nelson, Nelson was not prejudiced by the brief delay, particularly since the State did not use that evidence at trial. The trial court reasonably permitted the State to offer Nichols's and Velez's testimony at trial.

{¶ 49} The second assignment of error is overruled.

V.

{¶ 50} Nelson's third assignment of error states:

THE TRIAL COURT ERRED IN OVERRULING MR. NELSON'S MOTION TO STRIKE FIREARM SPECIFICATION AND MOTION FOR GRAND JURY TRANSCRIPTS.

{¶ 51} In his third assignment of error, Nelson claims that the trial court erred in denying his motion to strike the firearm specifications, which were added upon reindictment after Nelson declined to enter a plea. Nelson asserted that the government's actions constituted vindictive prosecution, and he requested the grand jury transcripts in order to support his claim that the specifications could have been included in the original indictment.

{¶ 52} According to defense counsel, Nelson and the State engaged in repeated and prolonged plea negotiations. During the course of those negotiations, the State advised defense counsel that "if [Nelson] did not plead guilty to aggravated robbery and possession of a weapon while under disability the State would return to the grand jury and seek firearm specification[s] to the instant charges." On December 30, 2011, Nelson was reindicted on the same charges; the new indictment added three firearm specifications.

{¶ 53} Prior to trial, Nelson moved to dismiss the specifications based on

vindictive prosecution. In response to Nelson's motion, the prosecutor informed the court that she was "not the original prosecutor who was assigned this case" and that she believed "that the additional firearm specifications were appropriate in this case and I did add those once I was assigned the case." The trial court denied the motion.

{¶ 54} "[I]t is not prosecutorial misconduct to threaten a defendant, in order to induce him to plead guilty to the offenses with which he has been charged, with the institution of more serious charges for which the State has substantial evidence." *State v. Myrick*, 2d Dist. Greene No. 96-CA-149, 1998 WL 57794, *3 (Feb. 13, 1998). As we stated in *Myrick*:

> We cannot distinguish the State's conduct in threatening to charge a greater offense, for which it had substantial evidentiary support, from charging that greater offense initially and then offering to reduce it. In fact, if we were to hold that a prosecutor must first formally institute the strongest possible charges for which it has evidence, before it may offer to allow a defendant to plead guilty to lesser charges, that might unduly and unnecessarily complicate the plea bargaining process. We can understand that the prosecutor might find it more difficult, politically, to reduce * * * a charge that has already been instituted in exchange for a plea to a lesser charge, rather than to accept a plea to a lesser charge before the greater charge has been formally instituted.

> As long as a prosecutor has a good-faith basis for charging a greater offense, we see no reason to preclude the prosecutor from offering to forego

the greater charge in exchange for a plea to a lesser charge, even if the lesser

charge is the only charge formally pending.

*Myrick* at *3.  *See also State v. Perkins*, 191 Ohio App.3d 263, 2010-Ohio-5161, 945

N.E.2d 1083 (2d Dist.).

**{¶ 55}**  We have further noted that a defendant is protected from prosecutorial

vindictiveness in the pre-trial setting by the grand jury system.  *Perkins* at ¶ 40.  "The grand

jury's historic functions survive to this day.  Its responsibilities continue to include both the

determination whether there is probable cause to believe a crime has been committed and the

protection of citizens against unfounded criminal prosecutions. * * * The scope of the grand

jury's powers reflects its special role in insuring fair and effective law enforcement."

(Citation omitted.)  *United States v. Calandra*, 414 U.S. 338, 343, 94 S.Ct. 613, 38

L.Ed.2d 561 (1974).

**{¶ 56}**  Nelson has not argued that the facts of his case did not warrant firearm

specifications, and it is apparent from the circumstances that those specifications were

reasonable.  All of the charges against Nelson were based on an allegation that Nelson had a

firearm during the commission of the offenses, and the evidence at trial reflected that Nelson

displayed a gun during the theft of Wheeler's money and then shot at Wheeler from a vehicle

while Wheeler pursued Nelson and his associates in his own vehicle.  The State could have

reasonably pursued the firearm specifications in its original indictment, and it informed

Nelson that it would add the specifications if he failed to enter a plea.  Nelson made an

informed choice not to plead to the charges.  We therefore conclude that Nelson was not

subject to unfounded or vindictive prosecution when the State reindicted him following the

breakdown of the plea negotiations.

**{¶ 57}** In addition, the trial court did not err in denying Nelson's request for the grand jury transcript, as that request was based solely on Nelson's desire to establish that the firearm specifications could have been included in the original indictment, a fact which is not disputed.

**{¶ 58}** The third assignment of error is overruled.

VI.

**{¶ 59}** Nelson's fourth assignment of error states:

MR. NELSON'S TWENTY YEAR PRISON SENTENCE IS CLEARLY

AND CONVINCINGLY CONTRARY TO THE LAW AND AN ABUSE OF

THE TRIAL COURT'S DISCRETION.

**{¶ 60}** Nelson's fourth assignment of error challenges his aggregate 20-year prison sentence.   He claims that his sentence is contrary to law and an abuse of discretion.

**{¶ 61}** We review a felony sentence using a two-step procedure.  *State v. Kalish,* 120 Ohio St.3d 23, 2008-Ohio-4912, 896 N.E.2d 124, ¶ 4.   "The first step is to 'examine the sentencing court's compliance with all applicable rules and statutes in imposing the sentence to determine whether the sentence is clearly and convincingly contrary to law.'" *State v. Stevens*, 179 Ohio App.3d 97, 2008-Ohio-5775, 900 N.E.2d 1037, ¶ 4 (2d Dist.), quoting *Kalish* at ¶ 4.   "If this step is satisfied, the second step requires that the trial court's decision be 'reviewed under an abuse-of-discretion standard.'"  *Id.*

**{¶ 62}** The trial court has full discretion to impose any sentence within the authorized statutory range, and the court is not required to make any findings or give its

reasons for imposing maximum or more than minimum sentences. *See State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, at paragraph seven of the syllabus. However, the trial court must comply with all applicable rules and statutes, including R.C. 2929.11 and R.C. 2929.12. *State v. Mathis*, 109 Ohio St.3d 54, 2006-Ohio-855, 846 N.E.2d 1, ¶ 37. In addition, under 2011 Am.Sub.H.B. 86, the trial court is obligated to make the findings required by R.C. 2929.14(C)(4) before imposing consecutive sentences. The trial court is also required to merge allied offenses of similar import before imposing sentence under R.C. 2941.25(A), *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, 922 N.E.2d 923, and to properly impose any other penalties required by law. *E.g.*, *State v. Fischer*, 128 Ohio St.3d 92, 2010-Ohio-6238, 942 N.E.2d 332 (post-release control); *State v. Harris*, 132 Ohio St.3d 318, 2012-Ohio-1908, 972 N.E.2d 509 (driver's license suspension).

{¶ 63} As stated above, Nelson was convicted of aggravated robbery, a first degree felony; felonious assault, a second degree felony; discharging a firearm on or near a prohibited premises, a second degree felony; and having a weapon while under disability, a third degree felony. Three of the charges had firearm specifications, which, by statute, must run prior to and consecutively to the sentences for the underlying felonies. R.C. 2929.14(C)(1)(a). The discharging a firearm on or near a prohibited premises charge was merged into the felonious assault charge, and the court sentenced Nelson to seven years for the aggravated robbery, plus three years for the firearm specification, and to seven years for the felonious assault, plus three years for that firearm specification. The court found that the two offenses were committed with a separate animus, and it ordered the sentences to run consecutively to each other, for a total of 20 years. The court imposed a 36-month sentence

for having a weapon while under disability, to be served concurrently with the other two sentences. All of the sentences were within the statutory range, and neither sentence for aggravated robbery and felonious assault was a maximum sentence.

{¶ 64} During the sentencing hearing, the trial court indicated that it had considered the purposes and principles of sentencing under R.C. 2929.11 and the seriousness and recidivism factors in R.C. 2929.12. The court found that consecutive sentences were necessary to protect the public from further crime and to "necessarily punish [Nelson's] behavior." The court further found that consecutive sentences were not disproportionate to the seriousness of Nelson's conduct and the danger that he posed to the public. The court told Nelson that "at least two of the multiple offenses were committed as part of one or more course of conduct and the harm caused by two or more of the multiple offenses was so great and unusual that no single prison term can adequately reflect [the] seriousness of your conduct and further that your history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by yourself." The trial court thus complied with its obligation to consider the statutory factors set forth in R.C. 2929.11 and R.C. 2929.12 and to make the findings required by R.C. 2929.14(C)(4) before imposing consecutive sentences.

{¶ 65} Nelson's counsel asked the trial court to merge the felonious assault and aggravated robbery charges, arguing that "if there was a gun pulled and a shot fired, it was all part of either conducting the robbery or fleeing from the robbery. Not really a separate act." R.C. 2941.25, which addresses the issue of merger, provides:

> (A) Where the same conduct by defendant can be construed to

constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

**{¶ 66}** "When determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered." *State v. Johnson,* 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, at syllabus. The Ohio Supreme Court explained:

Under R.C. 2941.25, the court must determine prior to sentencing whether the offenses were committed by the same conduct. Thus, the court need not perform any hypothetical or abstract comparison of the offenses at issue in order to conclude that the offenses are subject to merger.

In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the question is whether it is possible to commit one offense and commit the other with the same conduct, not whether it is possible to commit one without committing the other. * * * If the offenses correspond to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the

offenses are of similar import.

If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., "a single act, committed with a single state of mind." * * *

If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged.

Conversely, if the court determines that the commission of one offense will never result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not merge.

(Citations and quotations omitted.) *Johnson* at ¶ 47–51.

**{¶ 67 }** A defendant who argues on appeal that the trial court erred by not merging multiple offenses bears the burden to show that the offenses are allied pursuant to R.C. 2941.25. *State v. Hale*, 2d Dist. Clark No. 11 CA 33, 2012-Ohio-2662, ¶ 24.

**{¶ 68}** The trial court found that the felonious assault and aggravated robbery charges were committed with a separate animus, and thus they did not merge as allied offenses of similar import. Under the facts of this case, we agree with the trial court's conclusion that a separate animus existed and that the two offenses did not merge. In short, the record reflects that Nelson's sentences for his offenses and specifications were not contrary to law.

**{¶ 69}** Nelson claims that, even if the trial court complied with all applicable rules and statutes, his 20-year sentence amounts to an abuse of discretion. In general, an abuse of

discretion occurs when the trial court's decision is grossly unreasonable, unsound, illegal, or unsupported by the evidence. *State v. Robinson*, 2d Dist. Champaign No. 2012 CA 17, 2012-Ohio-4976, ¶ 17. In the sentencing context, a trial court ordinarily does not abuse its discretion when it imposes a sentence within the range permitted by the applicable statute. *Id.*, citing *State v. Bailum*, 2d Dist. Clark No. 2007 CA 55, 2008-Ohio-2999, ¶ 5.

**{¶ 70}** At sentencing, the trial court indicated that it had carefully reviewed the presentence investigation report and the written statements from Nelson's attorney, the State, Nelson, and Nelson's father. A victim impact statement was read to the court on behalf of Wheeler, in which Wheeler expressed that he had "attempted to help someone I understood to be a friend" and that he discovered that it was all an "elaborate setup to point a gun in my face and rob me of what I was attempting to give." Wheeler reiterated how Nelson had shot at him to "protect the $100 profit they had," and he expressed dismay that his life was apparently worth only $100 to Nelson. Wheeler requested a maximum sentence.

**{¶ 71}** Defense counsel argued on Nelson's behalf that Nelson had acted as an accomplice to the robbery and that "the spirit of what occurred is really one act." Counsel acknowledged that Nelson had "a pretty besmirched record," but he argued that Nelson was still young and that a moderate sentence would allow him to be rehabilitated and have a life. Counsel requested concurrent sentences on all of the charges.

**{¶ 72}** Speaking on his own behalf, Nelson expressed remorse that he went with his co-defendants on October 11, but he repeatedly challenged the evidence against him, including Wheeler's credibility and the evidence that he possessed and fired a gun. Nelson concluded:

* * * I'm not going to sit here and say I don't want you to take me away from my family and my kids. Yeah, I got kids. I got family, they're all here you know what I mean. But the guy didn't get hurt. He got his money back, he didn't get no damage to his car. That whole I tried to take his life, come on, man.

{¶ 73} Nelson's presentence investigation revealed that Nelson was 25 years old, and had three prior misdemeanor convictions and five prior felony convictions (burglary, theft, grand theft, receiving stolen property, and complicity to disrupt public services), four of which resulted in prison sentences. Nelson was last released from prison in December 2010. Nelson denied committing the instant offenses and claimed he was "just a passenger in the car." He told the investigator that the witnesses lied about his involvement in the offenses and said, "Honestly, who is the victim here? A guy who hired a prostitute who stole his money, or the person who the victim lied on?"

{¶ 74} In sentencing Nelson to 20 years, the trial court emphasized Nelson's lack of responsibility for his involvement in the offenses, that Nelson decided to purchase the gun immediately prior to the offense, that Nelson decided to brandish it during the theft and then fire it at Wheeler's car, and that "it is only out of luck or the grace of God that we're not here for someone being seriously injured or killed in this case." The court further noted that Nelson was released from prison less than one year before the commission of these offenses and that the crimes that he had committed were "escalating."

{¶ 75} The sentence that Nelson received was certainly severe. However, we conclude that Nelson's lack of remorse, his felony record and history of incarceration, and

his use of a firearm for two separate offenses on the same night justified the trial court's imposition of consecutive sentences and that the aggregate sentence of 20 years was not an abuse of discretion.

**{¶ 76}** Nelson's fourth assignment of error is overruled.

VII.

**{¶ 77}** Nelson's fifth assignment of error reads:

MR. NELSON WAS DEPRIVED OF A FAIR TRIAL DUE TO CUMULATIVE TRIAL ERRORS.

**{¶ 78}** In his fifth assignment of error, Nelson claims that all of the alleged errors at trial cumulatively resulted in prejudicial error, warranting a reversal of his conviction and a new trial.

**{¶ 79}** The Supreme Court of Ohio has stated that numerous harmless errors may cumulatively deprive a defendant of a fair trial and thus *may* warrant the reversal of his conviction. (Emphasis added.) *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995). The doctrine of cumulative error does not apply in this case because Nelson has not identified multiple instances of harmless error. *Id.*

**{¶ 80}** Nelson's fifth assignment of error is overruled.

VIII.

**{¶ 81}** The trial court's judgment will be affirmed.

. . . . . . . . . .

GRADY, P.J. and DONOVAN, J., concur.

Copies mailed to:

R. Lynn Nothstine
Lori R. Cicero
Hon. Dennis J. Adkins